**In the Matter of the Application of John W. C. SHERWOOD.**

**Appeal No. 79–579.**

United States Court of Customs and Patent Appeals.

Jan. 10, 1980.

---

Harold D. Messner, San Francisco, Cal., attorney of record for appellant; William J. Egan, III, San Francisco, Cal., of counsel.

Joseph F. Nakamura, Washington, D.C., for the Commissioner of Patents and Trademarks; Jere W. Sears, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and NEWMAN, Judge.*

BALDWIN, Judge.

This is an appeal from the decision of the United States Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejections of all the claims as unpatentable under 35 U.S.C. § 101 for being directed to nonstatutory subject matter and under 35 U.S.C. § 112, paragraph one, for being based on a specification which fails to disclose the best mode. This application, serial No. 567,458,[1] was filed April 14, 1975, and is entitled "Continuous Automatic Migration of Seismic Reflection Data with Waveform Preservation." We reverse.

---

* The Honorable Bernard Newman, United States Customs Court, sitting by designation.

1. This case is a continuation of a series of applications; the earliest of which is serial No. 768,149, filed October 16, 1968.

## The Invention

A very common method of geophysical prospecting involves the production of a sonic (or seismic) wave in the earth. Certain subsurface geological formations, which may contain petroleum deposits, will reflect this induced seismic wave upward where it will be detected by variously spaced surface geophones. Each resulting geophone signal, as recorded, is merely an amplitude-time representation of that reflected sonic wave and is known as a "seismic trace." This invention involves apparatus (or "means for") and a method for producing a cross-sectional map (or "seismic depth section") depicting the position and shape of those subsurface formations.

Claim 15 is typical of the "means"-type claims which recite apparatus for plotting the desired map:

15. A system for converting a seismic time section consisting of a plurality of amplitude-versus-time seismic traces, into a seismic depth section consisting of a plurality of amplitude-versus-depth traces, so that events on the time section are migrated, both vertically and horizontally, into positions on said depth section corresponding to the actual spatial positions of the seismic reflectors in the subsurface, comprising:

(a) automated data processing means for sonogramming said amplitude-versus-time traces, a group of traces at a time, to produce a plurality of sonograms each identified, indexed and stored with a respective horizontal pivot coordinate of a respective group of sonogrammed amplitude-versus-time traces, and with a represented moveout,

(b) machine means for dividing each individual sonogram into a series of segments in accordance with a pre-selected seismic velocity function, and re-indexing and storing, also in accordance with said preselected velocity function, each of said series of segments into a particular storage zonelet representing a portion of said seismic depth section identified and indexed by a particular depth and horizontal coordinate, each of said series of divid-

ed and stored segments also being identified and indexed within a particular zonelet in accordance with a represented dip angle,

(c) machine means for automatically sonogramming said segments divided and stored within each of the zonelets to produce a final plurality of amplitude-versus-depth representations and

(d) machine means for directing and plotting the placement of said final representations on said seismic depth section, so that said seismic reflectors in said subsurface can be identified, in the vertical and horizontal location, by amplitude variations on said amplitude-versus-depth traces of said depth section.

Claim 21 is illustrative of the "means"-type claims which do not recite a final plotting "means."

21. An apparatus for converting a seismic time section consisting of a plurality of amplitude-versus-time seismic traces, into a plurality of machine generated, amplitude-versus-depth representations, so that events on the time section are migrated, both vertically and horizontally, according to the depth and horizontal coordinates of the seismic reflectors within a subsurface earth formation, [sic] they represent, comprising:

(a) automated data processing means for sonogramming said amplitude-versus-time traces, a group of traces at a time, to produce a plurality of sonograms each identified by and indexed through a respective horizontal pivot coordinate and a represented moveout,

(b) automated means for machine dividing each of said individual sonograms into a series of segments in accordance with a seismic velocity function characteristic of the subsurface under study, and for each of a series of zonelets representing portions of said subsurface under study, said automated dividing means including separate means for placing, storing and indexing also in accordance with said seismic velocity function, said series of segments into said zonelets to provide said plurality of machine generated, amplitude-versus-depth representations.

The specification is largely directed to a discussion of analog computer apparatus suitable for producing the desired subsurface map by solving the disclosed equations. The specification also states:

The final seismic depth section reproduced in FIGURE 8 was actually prepared by performing the method of the present invention on a large scale digital computer. It should be understood that the analog apparatus here shown as mechanical devices electrically interconnected are intended to assist in the understanding of the invention. The best mode contemplated by the inventor of carrying out the invention is to perform the processing steps of the invention on a large scale digital computer with the processed data imprinted into visible form on any of the presently available plotting devices.

### The Rejection

The examiner stated in the Answer that the rejection was two-fold.

First, the examiner noted:

Claims 15, 18–23, and 27 are rejected under 35 U.S.C. § 112, paragraph one, as based upon an inadequate disclosure in that the best mode contemplated by the Applicant has not been described in sufficient detail to enable a person of ordinary skill in the art to make and use it. Applicant has failed to disclose *any computer hardware*, any *flow charts*, any *algorithms* or any *programs* with which his best mode would operate. [Emphasis in original.]

\*    \*    \*    \*    \*    \*

To achieve Applicant's invention a person skilled in the art would have to find digital hardware equipment able to carry out the invention, and devise flow charts and write programs which are not set out in the prior art.

To achieve Applicant's objectives would thus require experimentation at length and an inordinate amount of speculation, industry and ingenuity, as the disclosure is merely an invitation to others to see if they can obtain Applicant's objectives

which Applicant does not disclose how to obtain.

Secondly:

Claims 15, 18–23, and 27 are rejected under 35 U.S.C. §§ 100 and 101 as directed to a non-statutory class of invention. The present claims are directed to an automated digital processing system and method, and the *best mode disclosed is a programmed digital computer for carrying out the process.* Since initiation and reception of seismic signals, computer operations on seismic signals and sonogramming for seismic records *are old in the art,* any patent that would issue on applicant's claims would wholly preempt the algorithm and program for carrying out the invention. This would on practical effect be a patent on the algorithm and program themselves.

Applicant's assertion that the *Benson* decision [*Gottschalk v. Benson*, 409 U.S. 63 [93 S.Ct. 253, 34 L.Ed.2d 273], 175 USPQ 673 (1972)] upholds the patentability of the presently claimed invention fails to take into consideration the *entire* opinion as presented by Mr. Justice Douglas. Although the Court barred the conclusion that all software is unpatentable *per se.* 409 U.S. at 71 [93 S.Ct. 253], the Court did cite *the Report of the President's Commission, see supra,* and several law journal articles and concluded its opinion by admonishing the legislature that "considered action by the Congress is needed," 409 U.S. at 73 [93 S.Ct. 253]. Thus, *Benson* has merely stated that some computer process may be patentable without stating any prerequisites for such patentability. The policy basis for the decision, however, precludes patentability where, as in the present application, the invention comprises a program and algorithm utilized in conjunction with a digital computer. *The method sought to be patented has as its best mode application by programmed digital computer.* This being the case, the instant claims if allowed would wholly preempt the mathematical process as described by applicant in the specification and would in practical effect

be a patent on the mathematics, algorithm and program. [Emphasis in original.]

The examiner responded to appellant's brief in stating:

As regards to the rejection under 35 U.S.C. § 100 and 35 U.S.C. § 101 Appellant's distinguishing arguments are not without merit, but they fail to remove the instant invention from the scope of the decision in *Benson.* The novelty of the procedure herein claimed is merely in sequencing of operations within a digital computer in response to external signals, as to process seismic data in accordance with prior signals. The process is assertedly new merely in the nature of a program and algorithm.

\*    \*    \*    \*    \*    \*

Regarding appellant's arguments that the present invention can be carried out by an analog computer, it is noted that the claims read upon a general purpose digital computer implemented mode for carrying out the present invention. Furthermore, at page 24, lines 20–24 of the specification, applicant states that the best mode he contemplates for carrying out the invention is to perform the processing steps on a large scale digital computer. Concomitantly, the present claims, if allowed, would provide applicant with a patent monopoly on the digital processing mode, a mode unpatentable under 35 U.S.C. § 100 and 35 U.S.C. § 101.

Appellant's arguments as to the 35 U.S.C. § 112, "best mode" rejection are directed to the proposition that "as long as there is a statement in the specification that the best mode is by way of a properly programmed digital computer there is no problem with this portion of Section of 112." (Brief at page 12). It is the examiner's contention however, that when an applicant states that a particular method of carrying out his invention is the best mode contemplated by him as of the time he executes the application, he must disclose such an invention so as to enable one of ordinary skill in the art to make and use it. Only with such a requirement would inventors be restrained from applying for patents while at the same time concealing from the public how to make and use such preferred embodiments. Appellant's enabling disclosure of the non-preferred embodiment, i.e. the analog does not suffice to replace the requisite disclosure of the preferred embodiment.

It is seemingly clear that a reasonable level of ordinary skill in programming should be the capability of proceeding from adequately detailed algorithms and flow charts to an operative program. The detailing thereof should be at least to the level where all mathematical formulae, as well as all logic for the transformation or manipulation of data have been specified in terms commensurate with the usual subroutines available in the computer languages. *The specification fails to provide any such requisite detailing.* [Emphasis in original.]

### The Board

The board, in a first opinion, considered only the § 101 rejection and stated:

For the purposes of discussion, we address the details of claim 15 although our remarks are germane to the remainder of the claims also. Features (a)–(d), although characterized in "means" plus function language, describe the mathematical processing of data in accordance with equations given in appellant's specification \* \* \* for the purposes of reaching a solution to a seismic problem, namely, the generation of a seismic depth section indication. These features of claim 15 and the comparable subject matter of the remainder of the claims are directed to an algorithm within the definition provided in *Gottschalk v. Benson* \* \* \*.

\*    \*    \*    \*    \*    \*

We think the decision in *Parker v. Flook,* 437 U.S. [584, 98 S.Ct. 2522, 57 L.Ed.2d 451] . . ., 198 USPQ 193 (1978), is supportive of the position taken by the examiner. As the Court makes

clear, appellant's algorithm can be assumed to be within the prior art. Moreover, the use of the calculation in a post solution activity cannot transform an unpatentable principle into a patentable process.

We recognize the instant claims are within the technological arts, and have an end use, however, the Court in *Flook*, footnote 18, makes the following statement:

> "Very simply, our holding today is that a claim for an improved method of calculation, even when tied to a specific end use, is unpatentable subject matter under § 101."

We consider that the Court's observation is applicable to the facts of the instant case.

We affirm the rejection.

In a second opinion, initiated by a request for reconsideration, the board discussed the § 101 rejection. In this initial portion of the opinion (all members joining this section), the board responded to a number of appellant's arguments concerning that rejection:

> Beginning with the second paragraph of page 2 of the most recent paper, appellant urges that he produced a final *new* depth display previously unachieved. Appellant * * * admits that producing seismic time sections such as shown in Figure 1 is old in the art. Appellant's claimed subject matter appears directed to the data processing incident to the use of appellant's equations set forth on pages 18, 20 and 22, as we indicated in our original decision.
>
> We reiterate that, notwithstanding the purported novelty urged, the subject matter of the equations as claimed must be considered to be algorithmic and that, as the Court indicated in *Flook*, may be considered to be part of the prior art for the purposes of considering the compliance of appellant's claimed subject matter with regard to the statute.
>
> In the same paragraph, appellant contrasts the magnitude of the data processing incident to the practice of his inven-

tion with that which appeared to be required in the *Flook* [*Parker v. Flook*, 437 U.S. 584 [98 S.Ct. 2522, 57 L.Ed.2d 451], 198 USPQ 193 (1978)] case. Appellant has not adverted to any language in that decision however which sets out the magnitude of data processing as a criterion for determining whether claimed subject matter falls within 35 U.S.C. §§ 100 and 101 and we know of none.

On page 3 of the request, appellant maintains:

> "It should be brought to the Board's attention that the end-product of *Flook* was a number, and the Supreme Court indicated that the *only* difference between the claimed method and those available in the art was in the formula there presented."

Further, at the bottom of page 3, employing claim 15 as an example, appellant contrasts the detail set out in his claimed subject matter with the nature of the disclosure in the *Flook* patent application as commented upon by the court in that case. Appellant urges that he produced not an improved method of calculation, but a new depth section represented by a series of novel steps. [Emphasis in original.]

To these matters we say that in appellant's application, the end product, as disclosed in Figure 2, is a seismic trace "produced by the method of the present invention from the data represented in Figure 1." (Specification, page 5, lines 20–22). We repeat, the only difference between the claimed subject matter which produces an output such as Figure 2 and a conventional seismic time section as shown in Figure 1 appears to lie in the calculations performed in connection with the aforementioned equations.

In response to appellant's contentions that the best mode was adequately disclosed, a majority (two out of three members) noted in the final part of the opinion:

> Appellant in his specification thus indicates (a) that "in most cases" the invention will be performed by a large storage capacity high speed digital computer, and

(b) that Fig. 8 was obtained in such a fashion.

*   *   *   *   *   *

We think (a) coupled with (b) constitute an indication that the best mode of appellant's invention is a digital one which mode has been concealed, the concealment being of the nature described in *In re Gay*, 50 CCPA 725, 309 F.2d 769, 135 USPQ 311 (1962), cited by appellant. See also *In re Hay*, 534 F.2d 917, 189 USPQ 790 (CCPA [Cust. & Pat. App.] 1976).

Additionally, the majority discussed two affidavits submitted by appellant in support of the argument that the best mode was adequately disclosed.

With regard to the Miller affidavit,[2] it is not clear whether the work performed as described in paragraph 8 thereof was done solely as a result of the explanation provided by Dr. Sherwood as described in paragraphs 4–7 or whether subsequent interaction by the affiant with Dr. Sherwin was required in order to complete the project.

It appears that affiant, together with co-workers participated in preparing a Fourier transform program, following which affiant prepared a sonogram program. The time employed in these endeavors is not set forth. Further, no facts or evidence are adduced from which a determination can be made that the latter program was successful as averred and that it corresponded satisfactorily to the claimed subject matter. It thus cannot be determined whether or not undue experimentation was required in the effort described in paragraph 8 and accordingly, affiant's averment must be considered to be conclusory in character.

Averments 9–11 are not supported by facts or evidence of record and thus must also be considered as conclusory.

As for the Cardwell affidavit,[3] no data or evidence is adduced to substantiate the

---

2. The Miller affidavit essentially stated that, on the basis of a presentation given by appellant in 1967, a program for a digital computer using a Fourier transform method was written by affiant and three co-workers and successful computer runs made with the program. Subsequently, affiant alone wrote another program using the disclosed "sonogram" method. It was the opinion of the affiant that persons having education and work experience similar to his own (B.S. & M.S. in electrical engineering, 5 years in the "design and development of geophysical recording instrumentation and geophysical recording instrumentation" and 4 years of FORTRAN IV programming) would be able to easily write a successful computer program to carry out the method of the disclosure. Further, it was opined:

> [B]ased on his personal experience and observations, the English and mathematical statements, standing alone in said specification, and even without the physical analog embodiment, describe in such full, clear, concise and exact terms that a person of electrical engineering background with some experience in programming (a common background for workers in geophysical instrumentation and data processing) would be able to make and use a computer program for carrying out the method of the described invention.

3. The Cardwell affidavit (after establishing the not insubstantial credentials of the affiant) discusses the kind and quality of information that,

in the affiant's opinion, is desirable in communicating the manner of solving a problem using a computer program. The essence of the affidavit noted:

> 9. That the desirable elements of human-to-human communication in formulating, programming, and using computer programs are:
> (1) an over-all statement (in English and mathematics) of the problem to be solved,
> (2) the specification of the expected input, and desired output, quantities,
> (3) the specification of the forms of input and output,
> (4) the specification of the significant internal parameters of the process,
> (5) a set of statements of the mathematical and physical assumptions underlying the sought solution of the stated problem,
> (6) the writing of the relevant mathematical solution equations,
> (7) the specification of the conditional logic (according to which control is to be transferred between program statements depending on computed results).
> (Elements (5), (6) and (7) constitute the "algorithm" or the "trick" by which the problem, which may never have been solved at all before, may now be solved.)
> 10. That it is his opinion, based on his personal experiences and observations, that in the specification of the patent application, Serial No. 768,149, filed October 16, 1968, the English statements, the figures showing

averments made in paragraphs 10 and 11 and these must for this reason be considered conclusory.

One member of the board concurred in the result reached by the majority in the best mode issue, but advanced other reasoning in affirming the rejection. He considered the fact that appellant produced the seismic depth section found in Figure 8 of the specification via a digital computer to be evidence of concealment. Specifically, he stated:

[T]he appellant tells us that the "best mode" contemplated by him of carrying out the invention involves the use of a digital computer and has presented the results in Figure 8 of the drawings. Hence, the appellant must have known more about this embodiment than he disclosed. This failure to disclose what was known about the preferred embodiment of the invention at the time the present application was filed constitutes concealment prohibited by the best mode clause of the first paragraph of 35 U.S.C. § 112.

## OPINION

### § 112—Best Mode

■ As was noted in *Weil v. Fritz*, 601 F.2d 551, 555, 202 USPQ 447, 450 (Cust. & Pat. App. 1979) "[i]t is not up to this court to state *how* the applicant displays his information [disclosing best mode], but only, under proper circumstances, to review *whether* he has done so adequately under the statute." [Emphasis in original.]

forms of input and output, and the mathematical statements, of the specification of the patent application, Serial No. 768,149, filed October 16, 1968, comprehend all the elements (1) to (7) mentioned above with a completeness that is unusual, and beyond what is necessary, for the human-to-human communication that precedes the writing of computer programs to solve problems such as that treated in the subject specification.

4. The question of a specification's adequacy in this context is in no way related to the question of the specification's sufficiency in complying with the enablement requirement. *In re Gay*, supra at 731, 309 F.2d at 772, 135 USPQ at 315. Occasionally, the analysis of the technical information may be similar.

This case presents the question of whether appellant has "adequately" disclosed the contemplated best mode.

■ The board correctly recognized that there is no objective standard by which to judge the adequacy of a best mode disclosure.[4] Instead, only evidence of concealment (accidental or intentional) is to be considered. That evidence, in order to result in affirmance of a best mode rejection, must tend to show that the *quality* of an applicant's best mode disclosure is so poor as to effectively result in concealment.[5]

The evidence in this case, which is said to be probative of concealment, consists of the inventor's notation in the specification that the use of a digital computer was the best mode, the specification's Fig. 8 (a subterranean map produced by a digital computer) and the Miller affidavit which indicated the existence of useable computer programs.

Certainly the evidence unequivocally shows the existence of a working computer program as of the filing date. The board accurately notes that the inventor had more information in his possession concerning his contemplated best mode than he disclosed in the specification. Whether failure to disclose a listing of that known computer program is fatal is the question.

In general, writing a computer program may be a task requiring the most sublime of the inventive faculty or it may require only the droning use of a clerical skill. The difference between the two extremes lies in

5. A similar standard has been applied by other courts. For instance, in *Union Carbide v. Borg-Warner*, 550 F.2d 355, 193 USPQ 1 (6th Cir. 1977), the generic disclosure of an "extruder" apparatus as the best mode was insufficient in view of evidence that the inventor considered a special type of extruder to be necessary and desirable for practice of the invention. Similarly, in *Dale Electronics v. R.C.L. Electronics*, 488 F.2d 382, 180 USPQ 225 (1st Cir. 1973), the disclosure of the class "epoxys, phenolics or silicones" as a "recommended hardenable insulative material" was found to be an inadequate disclosure of the best mode in that the inventor testified that a number of materials within that class did not work and additionally he knew of a specific undisclosed material, Rogers RX600, that worked very well.

the creation of mathematical methodology to bridge the gap between the information one starts with (the "input") and the information that is desired (the "output"). If these bridge-gapping tools are disclosed, there would seem to be no cogent reason to require disclosure of the menial tools known to all who practice this art.[6]

■ The Cardwell affidavit outlines in a very reasonable manner the human-to-human elements necessary in communicating the concepts of a particular computer program to one having ordinary (or, indeed, less than ordinary) skill in this art. The specification provides the general mathematical equations used and teaches the further "trick" of chopping the physical input seismic traces into segments via a mathematical manipulation.[7] For this reason, the specification in our view delineates the best mode in a manner sufficient to require only the application of routine skill to produce a workable digital computer program.[8] Therefore, the quality of appellant's disclosure is not so poor as to result in the concealment of the best mode.

## § 101

The technical subject matter and statutory rejection in this case are quite closely related to those considered in *In re Johnson*, 589 F.2d 1070, 200 USPQ 199 (Cust. & Pat. App. 1978). The legal analysis here is, for that reason, quite similar in effect and method to that in *Johnson*.

■ In any event, as was done in *Johnson*, the analysis of the claims should start with the two-pronged test accepted by the full court in *In re Freeman*, 573 F.2d 1237, 197 USPQ 464 (Cust. & Pat. App. 1978), i. e., first, determine whether the claims directly or indirectly recite process steps[9] which are themselves calculations, formulae or equations, and; secondly, determine whether the claims taken in their entirety wholly preempt these calculations, formulae or equations. *In re Maucorps*, supra; *In re Diehr*, 602 F.2d 982, 203 USPQ 44 (Cust. & Pat. App. 1979).

■ The solicitor, however, urges that *Parker v. Flook*, supra, modified, to the point of extinction, the second step of the Freeman "nutshell" analysis.[10] The solicitor apparently would substitute, as a second stage of analysis, a consideration of each of the steps in a process in isolation and determine whether each is "old or conventional."[11] Indeed, the PTO brief is lit-

---

**6.** In assessing any computer-related invention, it must be remembered that the programming is done in a computer language. The computer language is not a conjuration of some black art, it is simply a highly structured language. Analogously, if a person were to express a complete thought in German, it would be no trick for a translator to convert that thought into a palpable English form. The thought, thus expressed, might not be worthy of Shakespeare, but it would be understandable to one who uses the English language. Similarly, the conversion of a complete thought (as expressed in English and mathematics, i. e., the known input, the desired output, the mathematical expressions needed and the methods of using those expressions) into the language a machine understands is necessarily a mere clerical function to a skilled programmer.

**7.** The step of dividing the traces into small segments is disclosed to provide the advantageous result of allowing the detection of small geologic subsurface irregularities otherwise undetectable.

**8.** Taking into account the expert opinions found in the two affidavits, it would appear that the detailed disclosure of the analog method in combination with the suggestion that a digital method should be used might be more enlightening to one having ordinary skill in the art than the computer listing or flow chart required by the PTO. We view the PTO's requirement as quite formalistic in view of the verbal flow chart provided by appellant in the specification. In any event, the touchstone is the content, not its form.

**9.** In *Freeman*, for the purpose of testing compliance with § 101, process and "means for" claims were treated in the same manner. We do the same here. *In re Maucorps*, 609 F.2d 481, 203 USPQ 812 (Cust. & Pat. App. 1979).

**10.** This "nutshell" analysis follows that found in *Gottschalk v. Benson*, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273, 175 USPQ 673 (1973).

**11.** The Supreme Court in *Parker v. Flook* discussed *Mackay Radio and Telegraph v. Radio Corporation of America*, 306 U.S. 86, 59 S.Ct.

tle more than a catalog of steps considered to be old and steps considered to be mathematical in nature. This manner of viewing only portions of claims certainly is not countenanced in a fair reading of *Parker v. Flook*. The Court specifically noted therein "[o]ur approach to respondent's application is, however, not at all inconsistent with the view that a patent claim must be considered as a whole." *Id.*, 437 U.S. at 594, 98 S.Ct. at 2528, 198 USPQ at 199. As was noted in *In re Diehr*, supra at 988, 203 USPQ at 51, "[t]he novelty * * * of any element or even of all the elements or steps, or of the combination has no bearing on whether the process is encompassed by § 101." [12]

In any event, appellant concedes that the first step of the *Freeman* test is met. Each of the claims recites "re-indexing and storing" in accordance with the "seismic veloci-

ty function." An examination of the specification does indicate that certain mathematical equations are used in conjunction with such steps. The claims must be said to include the indirect recitation of a mathematical equation.

▪ The second *Freeman* step requires analysis of a claim, as a whole, "to determine whether or not it merely defines a method of solving a mathematical problem. If it does not, then it defines statutory subject matter." *In re Johnson*, supra at 1079, 200 USPQ at 208–208.

▪ The solicitor makes the argument that a number of the claims [13] are *only* mathematical in nature. It is said that as the appellant's "claim preambles indicate, appellant is really mathematically converting one set of numbers into a new set of numbers." [14] We do not agree with such a

---

427, 83 L.Ed. 506, 40 USPQ 199 (1939) and pointed to the analysis therein as proper in cases involving this issue. We would observe that use of the solicitor's analysis on the claims in *Mackay*:

4 "15. An antenna comprising a pair of relatively long conductors disposed with respect to each other at an angle substantially equal to twice

$$50.9 \left( \frac{l}{\lambda} \right)^{-0.513}$$

degrees, *l* being the length of the wire and the operating wave length in like units, and means in circuit with said antenna for exciting the conductors in phase opposition whereby standing waves of opposite instantaneous polarity are formed on the conductors throughout their length."

Claim 16 claims an antenna arranged in conformity to the empirical formula, as in Claim 15, with "a similar parallel pair of conductors spaced an odd number of quarter wave lengths away from said first mentioned pair * * *" These parallel wires constitute the "reflector," which, as already noted, was old in the art.
[*Id.* at 96 n. 4, 59 S.Ct. at 432, 40 USPQ at 203 n. 4.]
would result in a finding that those claims were unpatentable since the "conductors" were old and the equation is to be ignored. The Supreme Court has told us by its decision in *Mackay Radio* that the *interrelationship* of equations and other claim portions is of paramount importance. *Parker v. Flook* had no such interrelationship in that the steps of the claims only produced a number.

12. The PTO contends that this statement in *Diehr* conflicts with *Parker v. Flook*. We disagree. We believe the Court adequately treated such dichotomy in noting:

This case turns entirely on the proper construction of § 101 of the Patent Code, which describes the subject matter that is eligible for patent protection. *It does not involve the familiar issues of novelty and obviousness* that routinely arise under §§ 102 and 103 when the validity of a patent is challenged. [Emphasis added. *Id.* at 588, 98 S.Ct. at 2524, 198 USPQ at 196.]

13. The remainder of the claims, 15 and 18–20, provide for plotting the "refined signals" and are apparently conceded to be more than merely mathematical in nature. Nevertheless, the plotting step is said to be only a "post-solution activity" and, in the solicitor's view of *Parker v. Flook*, additional evidence that these claims recite non-statutory subject matter.

14. The board relied on a somewhat similar analysis when it noted that the "only difference between the claimed subject matter which produces an output such as Figure 2 and a conventional seismic time section as shown in Figure 1 appears to lie in the calculations performed in connection with the aforementioned equations." Even if this is an attempt to follow *Parker v. Flook*, it is an overbroad recital of the Court's analysis.

The error of this broadbrush analysis is amply exemplified by its simple application to the claims found patentable by the Supreme Court in *Mackay Radio*, supra at footnote 11. In that case, the only difference between the claimed

characterization. Each of the claim preambles recites a system for converting a "seismic time section consisting of * * * amplitude-versus-time seismic traces" (these seismic traces are electrical signals from geophones, i. e., *physical* apparitions, or particular patterns of magnetization on magnetic tape, i. e., the pattern of the magnetization being a *physical* manifestation, or a *physical* line on a paper chart) into a "seismic depth section consisting of * * amplitude-versus-depth traces" (a subterranean cross-sectional map). The claimed invention, contrary to the solicitor's arguments, converts one physical thing into another physical thing just as any other electrical circuitry would do.

Accordingly, we see no basis for adjudging any of the claims to be mere methods (or means) for solving mathematical equations and find the claims to be within the bounds of § 101.

### Conclusion

We *reverse* the decision of the board with regard to each issue.

*REVERSED.*

antenna and prior art antennas lay in the calculation used to describe the physical relationship between the elements. Under the board's analysis, such a claim would be nonstatutory.