**UNITED STATES DEPARTMENT OF ENERGY, Charles A. Fenstermacher and Keith Boyer, Appellants,**

v.

**Jack D. DAUGHERTY, Diarmaid H. Douglas-Hamilton, Richard M. Patrick and Evan R. Pugh, Appellees.**

**Appeal No. 81–610.**

United States Court of Customs and Patent Appeals.

Aug. 27, 1982.

As Modified on Denial of Rehearing Oct. 22, 1982.

Roger S. Gaither, Livermore, Cal., and Linda J. Shapiro, Washington, D. C., for Dept. of Energy.

John A. Lahive, Jr., Edmund R. Pitcher, Boston, Mass., and Melvin E. Frederick, Wilmington, Mass., for appellees.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

RICH, Judge.

This appeal is from the decision of the United States Patent and Trademark Office Board of Patent Interferences (board), adhered to on reconsideration, awarding priority of invention with respect to all counts in interference to the senior party, Daugherty et al. (Daugherty). We affirm.

### Background

Involved in this interference are Daugherty U.S. Patent No. 3,702,973, issued to Avco Corporation, assignee, November 14, 1972, on an application filed September 17, 1970, and application serial No. 162,074,

filed July 13, 1971, by Fenstermacher and Boyer, assignors to the United States as represented by the Department of Energy. The patent is entitled "Laser or Ozone Generator in which a Broad Electron Beam with a Sustainer Field Produce a Large Area, Uniform Discharge." The application is entitled "Electron Beam Method and Apparatus for Obtaining Uniform Discharges in Electrically Pumped Gas Lasers."

The counts call for method and apparatus for creating uniform volumetric discharges in gaseous working media. The invention is potentially useful in many applications, most notably lasers. In previous similar devices, an electric field was used both to ionize the working medium (production), and to move the ions (transport). The involved invention differs from those devices in that it uses separate, independent mechanisms for production and transport. An electric field is still used for transport, but production is created and controlled by externally applied ionizing radiation, an electron beam in the disclosed embodiments. The electric field is purposefully kept weak so that it cannot contribute substantially to ion production. More precisely, a criterion expressed as the electric field gradient E divided by the pressure of the gaseous working medium p (E/p) is kept low so that the Townsend coefficient, a measure of field-induced ionization (called "self-regenerative ionization" in the counts), is negligible. A requirement that this criterion not exceed threshold values associated with self-regenerative ionization is expressed in part (d) of count 1 (hereinafter "count 1(d)"), and in similar language in the other counts.

Count 1 is illustrative of the five counts in interference:

1. In the method of producing a spatially uniform controlled discharge substantially throughout a gaseous working medium in a working region, the steps comprising:

    a. providing a gaseous working medium at a pressure in a working region disposed in a cavity having imperforate walls for confining the gaseous working medium that upon the production of secondary electrons in said medium said medium has ambipolar and thermal diffusion rates incapable of damping local increases in secondary electron density in said medium;

    b. generating ionizing radiation externally of said cavity;

    c. introducing said ionizing radiation into said cavity through one of said walls to produce substantially throughout said working region a substantially spatially uniform predetermined density of secondary electrons in said medium by ionizing said medium, said one wall being impervious to gases and pervious to said ionizing radiation; and

    d. providing a sustainer field for providing substantially uniformly throughout said working region a predetermined electron temperature effective to increase the average energy of said secondary electrons without substantially increasing said predetermined electron density by self-regenerative ionization, said electron temperature producing said controlled discharge substantially uniformly throughout said working region at a predetermined level.

Count 2 is a similar apparatus count, count 3 depends therefrom, count 4 is another independent method count, and count 5 depends from count 4. Counts 1–5 correspond to claims 1, 7, 13, 16, and 19 of the Daugherty patent, which applicants copied as claims 29–33 of their application to provoke this interference.

Appellants attempted to prove priority dates, by actual reduction to practice, of November 24, 1969, for counts 1 and 2; of February 10, 1970, for all counts; and September 2, 4, and 8, 1970, for counts 3, 4, and 5. Each date or set of dates corresponds to a group of experiments, the groups being distinguishable from one another according to the type of electron beam source used.

The November 24, 1969, experiment was performed using an electron accelerator called a Febetron. "Febetron" is the trade designation of an electron accelerator gun

commercially available from the Field Emission Corporation. It produces a narrow pencil beam of relativistic electrons in 3 to 5 nano-second pulses.

The February 10, 1970, experiments were run with an electron gun called the Phermex. "Phermex" is an acronym for pulsed high energy radiographic machine emitting x-rays. Applicants switched to the Phermex as the ionizing radiation source because of its longer pulse length—around 0.2 microseconds. As the name behind the acronym suggests, the Phermex system was originally designed as an x-ray source, and incorporates an electron gun, a three-cavity linear accelerator, and a tungsten target which produces x-rays when bombarded with highly energetic electrons. The entire Phermex system is approximately 142 feet long. Applicants apparently did not use the entire system, but only the Phermex electron gun. The cathode of the Phermex gun has a diameter of 10 centimeters, or about 4 inches. Hence, in this case it has come to be known as the 4″ Phermex.

The September 1970 experiments were performed with a Phermex gun having a 2″ diameter cathode; and this device has been dubbed the 2″ Phermex. It is a scaled-down version of the 4″ Phermex. Applicants switched from the 4″ to 2″ Phermex because the 4″ Phermex was under the control of another research group, and applicants had access to it only when their use did not interfere with that group's experiments. Applicants had unlimited access to the 2″ Phermex.

Although the testimony of record in this interference is voluminous, the parties are in dispute over the import of only a few statements made by a handful of key individuals. Two are the applicants, Dr. Charles Fenstermacher, who was the head of the laser task force, and the man to whom he reported, Dr. Keith Boyer. Other electrical engineers who actually performed the experimental work were John Rink and Murlin Nutter. The electrical engineer most familiar with the operating characteristics of the Phermex system was Robert Stapleton, who, along with the senior mechanical technician named Jimmy Elliott, maintained it for the research group, group GMX–11, who loaned it to the applicants. Appellants also cite the testimony of David Gregg, a researcher in lasers suitable for laser fusion at Lawrence Livermore Laboratory, who was familiar with Dr. Boyer and his work.

As already mentioned, appellants allege that each group of experiments constitutes a conception and an actual reduction to practice of the invention of the counts. Appellants also alleged at final hearing before the board that Daugherty should not be allowed to rely on the filing date of the Daugherty patent as a constructive reduction to practice because of failure to comply with the enablement and "best mode" requirements of 35 U.S.C. § 112.

## Summary of the Board Opinion

The board held that appellants had failed to prove either conception or reduction to practice prior to Daugherty's filing date. The board further held that even if appellants had proved conception, they had not established diligence during the critical time period from before September 17, 1970, until applicants' filing date. The board also held that neither of appellants' § 112 attacks on Daugherty's patent had been timely raised and rejected the "best mode" challenge on the additional ground that "best mode" is not ancillary to priority when asserted against an involved application or patent. Accordingly, the board awarded priority to Daugherty on all counts.

## OPINION

### Preliminary Points

There are two points the early resolution of which will greatly facilitate the ensuing discussion. The first involves the meaning of the phrase "a *substantially spatially uniform* predetermined density of secondary electrons" (emphasis ours) which appears in count 1(c), supra, as well as in other counts. Appellants contend that Daugherty defined "substantially spatially uniform" in his specification to mean simply "non-spoking"

or nonarcing. Thus, appellants contend that they have made out their case upon establishing that applicants had obtained non-spoking discharges. The passage allegedly containing this definition reads:

As will now be apparent, the present invention permits the provision in a flowing gas laser of a spatially uniform discharge at the optimum electron temperature required for efficient laser operation at arbitrary pressure levels and physical sizes. While the invention is not so limited, this may be accomplished by utilization of the aforementioned two-step process comprising preferably, first an electron beam which creates in the gas a non-spoking predetermined spatial distribution (preferably uniform) electron density or ionization * * *.

Contrary to appellants' assertion, however, this passage does not equate substantial spatial uniformity with the absence of spoking. In fact, it clearly implies that a uniform discharge is but one type of non-spoking discharge and so that there are non-spoking density distributions which are not substantially uniform. Citation of this particular passage therefore adds nothing to appellants' case.

Appellees advance an alternative specification-based definition of the phrase "substantially uniform." They cite the portion of their patent specification which reads:

Thus, for many of the laser applications, the intensity of the electron beam must be substantially uniform (with variations not exceeding about a few percent) in order to produce a working medium with the substantially uniform ionization necessary to provide uniform gain and optical properties in the lasing medium.

Appellees contend that this passage supports the proposition that "substantially uniform" means that variations do not exceed a few percent. The passage, however, describes the intensity of the electron beam, not the intensity of the resulting ionization. Thus, it also adds nothing directly to the discussion of what it means to have a "substantially uniform" ionization, i.e., "density of secondary electrons," to use the count terminology.

This leads to the second preliminary point—the relation between uniform beams, uniform ionization, and uniform discharges. The language of the counts is concerned only with the uniformity of the density of the secondary electrons, that is, of the ionization. The evidence in the case, however, deals with uniformity of the incoming electron beam and the resultant discharge. Presumably, this is because it is possible to infer the existence of a uniform ionization if the beam is uniform or if the resultant discharge is uniform. The exact nature of the relationship of these events is never firmly established by the evidence, however. Thus, we are left with unanswered questions such as (1) whether a uniform beam is necessary to achieve uniform ionization, (2) whether a uniform beam is sufficient to ensure uniform ionization, and (3) whether a uniform discharge necessarily indicates that the ionization causing it was substantially uniform. As to the first two questions, we will assume the position most favorable to appellants that is consistent with the evidence, which is that a uniform beam may not have been necessary but would have sufficed to create uniform ionization. As to the third question, the board was of the opinion that a uniform discharge did not necessarily imply that the ionization was substantially uniform. It said:

We do not find it established by the junior party that the discharges which it produced within the gaseous medium during tests and which it considers uniform *resulted from* an externally applied ionizing radiation which *produced* a substantially spatially uniform predetermined density of secondary electrons in said medium substantially throughout a working region. It is *as likely* that any uniformity of discharge was a result of *the effect of the electric field* transporting free, secondary electrons within the medium. [Emphasis ours.]

We do not know the source of the board's conjecture, but we agree with appellants that it is unsupported in the record. We therefore will not assume the existence of

an intervening mechanism which permits a non-uniform ionization to lead to a uniform discharge. In the following discussion, we will assume, *arguendo*, that a uniform discharge implies substantially uniform ionization.

### Conception and Reduction to Practice

#### Febetron

The board found that the Febetron experiments were not a conception of the invention of the counts because

> The means relied on by the party, Fenstermacher, the Febetron, produces a pencil beam, which spreads as a plume or cone upon entry into the working medium within the chamber. It appears highly unlikely that this plume would produce a substantially uniform predetermined density of secondary electrons in the medium substantially throughout the working region and the junior party has not carried its burden of establishing such. * * * Furthermore, due to the cone shape of the beam in the gaseous medium, a uniform distribution of secondary electrons would not be produced in that part of the working region (the discharge volume) of the gaseous medium which is outside the cone and between the electrodes.

Appellants charge that in making its negative findings on conception, the board failed to consider applicants' photograph of a substantially uniform Febetron discharge. However, they discount Dr. Fenstermacher's admission that the ionization density shown in the photograph was not uniform, as predicated on a technical definition of the word "uniform" peculiar to one of ordinary skill in this art. Appellants also rely on the testimony of Gregg that the discharge shown in the photograph was "very uniform," and that the high contrast of the film used to take the photograph exaggerates the degree of nonuniformity. Appellants assert that the board placed undue weight on the discovery testimony of applicants and Rink in ascertaining applicants' actual research goals around the time of the Febetron experiments. Appellants further assert that the board was incorrect in finding that selection of an E/p value which prevented self-regenerative ionization was not corroborated until December, 1969, the month after the Febetron experiments.

Appellees counter that the challenged finding is amply supported by the record. The photograph, they contend, clearly shows nonuniformity in the Febetron ionization. They quote the testimony of Dr. Fenstermacher, in which he carefully conveyed that his use of the term "uniform," though less stringent than the lay definition, does not characterize the Febetron discharges. They also quote testimony of similar import by Dr. Boyer. With regard to when applicants first realized the benefits of low E/p ratios, appellees cite a report in which Dr. Fenstermacher states that the Febetron device was susceptible to arcing and that work by another researcher indicated that low E/p values would permit stable plasmas to form. They further rely on the testimony of Dr. Boyer and Rink to show that the realization concerning low E/p values came only after completion of the Febetron experiments.

■ We hold that there is ample support in the record for the board's finding on conception. The evidence demonstrates that applicants themselves did not regard the Febetron discharges as uniform. The board did not place undue weight on these admissions. The photograph appellants rely on certainly does not establish that the Febetron discharge was uniform. Appellees' argument that it shows nonuniform discharge appears well founded. Whether this nonuniformity is due to the conical plume of the Febetron beam is immaterial. We also agree with the board that there is no corroboration for the assertion that applicants appreciated the significance of using low E/p values during the Febetron experiments, even though they may have used such values in those experiments.

Although the board found that the Febetron experiments failed to establish conception of the invention of the counts, it went on to decide that neither were they an actual reduction to practice. As mentioned earlier in this opinion, one reason for this

finding was that the board believed that some mechanism beside substantially uniform ionization, specifically electron transport, could have produced any uniform discharge. Another reason was that the Febetron device had no utility for its intended purpose as a laser. The board also held that the Febetron device did not satisfy count 1(d) and similar language in other counts, because the applied sustainer field substantially increased electron density.

█ We have already asserted that we will not join the board in its hypotheses concerning alternative causes of uniformity in volumetric discharges. We also agree with appellants that the board's requirement that the Febetron device be able to lase was in error. Daugherty's own specification and testimony establish that volumetric discharges have utility in many applications beside lasers. Such discharges thus have utility apart from any single objective, regardless of whether that objective was the one applicants ultimately intended to achieve. This can hardly be denied in view of the fact that none of the counts require lasing. It was thus improper for the board to require that a device be capable of lasing before it could satisfy those counts.

While we thus agree with appellants that certain parts of the board's rationale for holding as it did were faulty, we nevertheless hold that the board's *conclusion*, which is, ultimately, all we review, is sound. Appellants' failure to establish that the Febetron device produced substantially uniform ionization as required by the counts ends the matter with regard to reduction to practice.

*The 4″ Phermex*

Preliminarily, we note the parties' disagreement over the diameter of the beam actually emitted by the 4″ Phermex gun used in the February 1970 experiments. Appellants maintain that the 4″ gun yielded an unfocused, parallel beam having an energy and density constant to within five percent over its entire 4″ diameter. This requires that the output beam not be made either to converge or diverge by the focusing magnets. Daugherty contends that the beam was not parallel and wide, but focused down to a few millimeters, and that attempts to obtain a beam having a greater diameter would have constituted defocusing, and would have produced a beam the density of which would not have been substantially uniform. The board advanced no explicit opinion on the diameter of the beam actually used, merely saying "We note that there is insufficient evidence to establish that the Phermex gun was successfully modified prior to the senior party's filing date to produce a broad area beam." From the context, it appears the board was discussing the 4″ Phermex gun.

We agree with the board. Our review of both parties' numerous citations to the record on this point leaves us unable to conclude whether the 4″ Phermex gun in fact produced a substantially uniform, broad area beam in the February 1970 experiments. The unmodified Phermex gun was designed to produce an extremely narrow electron beam for optimal injection into the first cavity of the accelerator portion of the Phermex system. To achieve this, the 4″ diameter beam emitted by the cathode was focused by two magnetic lenses or coils within the gun. While applicants contemplated altering the focusing to obtain a broad area output beam, it is unclear what this entailed or whether it was actually done. Even if it was done, the evidence does not establish whether the resultant beam was substantially uniform.

The first crucial question left unanswered by the evidence involves the precise nature of the modifications envisioned by applicants. The focusing properties of the magnetic coils could have been altered by changing the amount of current supplied them, or by changing the coils themselves. Rink's testimony that they asked Elliott to change his "focusing procedure" leaves open the possibility that either method or both methods may have been contemplated. Appellants in their brief say that "The Phermex gun did not require modification in order to obtain the four inch diameter beam. It required only an adjustment of

the magnetic focusing lens." Yet, there is discussion in the record of removing the lenses and installing larger lenses. Clearly, there were times when more than merely changing coil currents was contemplated.

It is equally unclear whether any modifications were actually performed. Much of the testimony cited by appellants on this score is mere prospective discussion of altering the focusing. Thus, Rink says merely that "We asked that they change their focusing procedure," and that "later in January, 1970 * * * we asked for a more parallel beam coming out of the gun." Stapleton says that "There was some discussion * * * to use the output lenses to defocus the beam." Yet, despite these statements of intent, appellants have not cited any statement to the effect that modifications actually were accomplished, or what the nature of those modifications were. To the contrary, Rink also testified that the beam he saw coming out of the 4″ Phermex on February 10 was conical. Appellants refer to the notation on a graph associated with the February 10 experiment, which contains the notation "Beam diameter * * * 4 inches." As appellees indicate, however, it is entirely possible that this notation merely means that the beam at the cathode was 4 inches in diameter.

Finally, we have unresolved questions about the uniformity of any broad area beam which a modified apparatus may have produced. Stapleton testified that the beam at the cathode was uniform to within 5 percent; yet the beam profile included in the publication describing the Phermex system shows a beam which varies in intensity by at least 10 percent. These values are for the unmodified system. Stapleton also testified that *defocusing* the beam would result in nonuniformities. It is unclear whether trying to obtain a 4″ diameter beam would have constituted defocusing; but at the very least, this testimony raises doubts about the uniformity of the beam which should have been resolved. These doubts are deepened by the references in the testimony to the need for remapping the energy density profile of the beam after modification. While it appears that this remapping was eventually accomplished, there is no clear indication whether it revealed a uniform beam density.

Thus, the evidence fails to establish several crucial elements in appellants' argument that applicants had produced a uniform beam and, hence, a substantially uniform ionization. Under these circumstances, we hold that the board committed no error in holding that there was insufficient evidence that the gun had been modified.

All this having been said, we can rapidly dispose of appellants' arguments that the 4″ Phermex gun work evidenced a conception of the counts. This is because appellants assert as premises for their arguments that the 4″ Phermex inherently produced a broad, parallel beam and that it did not have to be modified to do so. As set forth above, the evidence fails to support these assertions. The board committed no reversible error in holding that the evidence did not establish a conception.

With regard to actual reduction to practice, appellants assert here also that the board improperly relied on the 4″ Phermex device's apparent inability to lase as a basis for finding that it was not a reduction to practice. We agree, but find the error inconsequential.

The only remaining assertion not covered by the foregoing discussion on beam diameter is that the 4″ Phermex device produced uniform *discharges*. To establish this, appellants do not adduce any photographs of the 4″ Phermex device in discharge on the date they allege for an actual reduction to practice. Instead, they proffer a photograph which may have been taken after Daugherty's filing date of a discharge of a *different* device. They tie this photograph to the device and discharges in issue through the testimony of Rink. Thus, in their main brief they say:

> Rink testified that (1) he had observed "uniform volumetric discharges" such as the one shown in photograph B "hundreds of times out at GMX–11 starting back in December 1969, R 1288, and (2) these discharges "looked quite similar when using a laser mix" to the "reddish-

purple glow, very uniform" in a low-pressure cw $CO_2$ laser, with which he was familiar * * *.

This testimony amounts to no more than an assertion that the discharge in the photograph resembles those obtained using the 4″ Phermex device around the date in issue. Rink also testified, however, to having seen a luminescent cone when using the 4″ Phermex device. Inasmuch as the discharge in the photograph has no such cone, we cannot unqualifiedly accept the statement from the same man that the discharges were similar. Stapleton also testified to having seen a very pure and uniform discharge from the 4″ Phermex device with a potential applied across the gas. This testimony must be recognized as a conclusory statement from one without intimate knowledge of the precise experimental conditions surrounding his observation. Such inconclusive evidence fails to convince us that the board erred in holding that the experiments with the 4″ Phermex did not establish an actual reduction to practice.

*The 2″ Phermex Device*

The board did not discuss the 2″ Phermex device separately from the 4″ Phermex device in rendering its negative findings on conception. The board did mention, however, the installation of a larger electron gun window, a so-called "showerhead" window, as evidence of lack of conception, because this step was not taken until after the alleged conception supposedly evidenced by the 2″ Phermex experiments. As to actual reduction to practice, the board included the 2″ Phermex device in its blanket finding that appellants had not established that any of their devices produced substantially uniform ionization. The board also held that the 2″ Phermex device was not a reduction to practice of counts 4 and 5 because those counts call for a "broad area electron beam," while the 2″ Phermex produced only a narrow "pencil" beam.

Appellants contend that the beam from the 2″ Phermex was *not* linear or pencil shaped, but rather a rapidly expanding cone. They contend that tests conducted by Rink and Nutter showed that the beam entered the working region with a 2″ diameter and expanded at a 120° angle thereafter. They also contend that the use of the showerhead window, while it may have evinced a desire to achieve *greater* uniformity, was not evidence that the ionizations obtained prior to its use were not substantially uniform.

We agree with the board's conclusion with respect to both conception and reduction to practice. Whatever the shape of the beam, there remain unresolved questions about the beam's uniformity. Rink testified that they would "focus or defocus the beam" to get varying spot sizes. Stapleton testified that the characteristics of the 2″ gun were the same as the 4″ gun, yet Stapleton also testified that defocusing the 4″ gun would necessitate a sacrifice of beam uniformity. One can only conclude, therefore, that defocusing the 2″ gun's beam would have a negative effect on that beam's uniformity. No evidence is cited by appellants which can dispel this conclusion. Nor is there evidence of the production of uniform discharges *around the time of the alleged conception and reduction to practice* from which one could infer a substantially uniform ionization. The board's findings are supported by the evidence, and we will not overturn them.

As to the installation of the "showerhead" window, all the board said was that it was "evidence that the junior party was not aware of means to produce substantially throughout a working region a substantially uniform predetermined density of secondary electrons." We agree. Installation of the showerhead window supports the board's conclusion that applicants had not yet achieved the required uniformity. In fact, from Dr. Fenstermacher's description, it is evident that installation of the showerhead window produced a great improvement in uniformity. Such efforts in this case certainly increase the probability that applicants had not, before installation of the showerhead window, achieved substantial uniformity.

*The § 112 Issues*

In their brief before the board, appellants mounted two attacks on Daugherty's patent—in effect on its validity—based on 35 U.S.C. § 112. The first was lack of enablement because the specification does not teach one of ordinary skill in the art how to make and use the subject invention, § 112, first paragraph. The second was that the Daugherty patentees failed to set forth the best mode contemplated by them of practicing the invention at the time they filed their application. The board refused to consider either attack because appellants had neither raised them in a timely motion for dissolution nor shown good reason why such a motion had not been earlier presented, as required under 37 CFR 1.258. The board further refused to consider the "best mode" issue because it did not deem "best mode" ancillary to priority when asserted against an involved patent.

In this court, appellants devote a single page to both of these issues at the very end of their main brief, criticizing the board's refusal to consider them only because it was "an elevation of form over substance." We affirm the board's refusal to hear both issues for unexplained untimeliness and so do not reach the issue of whether "best mode" would have been ancillary to priority in this case.

■ Our discussion starts with the observation that, under the PTO rules, when no motion to dissolve has been timely made, as is the case here, "to prevent manifest injustice the Board of Patent Interferences may *in its discretion* consider a matter of this character even though it was not raised by motion." 37 CFR 1.258(a). (Emphasis ours.) Thus, the matter is committed to the sound discretion of the board, and we should reverse the board's decision on such a matter only if that decision was an abuse of that discretion.

■ We find no such abuse in this case. Appellants allege that evidence uncovered only after the end of the motion period convinced them of the propriety of raising the § 112 issues. The new evidence on the enablement question was the opinion of Daugherty's final expert witness that the count conditions were not satisfied by Daugherty's sole disclosed working example. Appellants, however, presumably had access to experts of their own, not to mention the evident expertise of applicants themselves. Thus, there was no reason why appellants themselves could not have discovered the alleged defect in the Daugherty specification. Under these circumstances, the board did not abuse its discretion when it declined to take up the enablement issue.

The "best mode" question, if regarded as distinct from the enablement issue, might present a closer question because a strict "best mode" issue involves knowledge of facts peculiarly within the possession and control of Daugherty, specifically, the state of mind of the Daugherty patentees at the time they filed their application. Were they deliberately concealing something? *See In re Gay*, 50 CCPA 725, 309 F.2d 769, 135 USPQ 311 (1962). However, appellants' so-called "best mode" attack is really no more than a side effect of its lack-of-enablement attack. It does not allege that Daugherty failed to disclose his "best mode"; it alleges that Daugherty disclosed no mode at all. The situation is like that in *In re Glass*, 492 F.2d 1228, 1233, 181 USPQ 31, 35 (Cust. & Pat.App.1974), where this court said:

> With respect to the failure to comply with the "best mode" requirement of § 112, * * * we do not regard the situation here as presenting a "best mode" problem. Failure to set forth *any* mode—which is the situation here—is equivalent to nonenablement. The "best mode" provision is directed to a different type of situation. [Emphasis in original.]

Thus, appellants' "best mode" attack is in substance no more than an alternative way of stating its lack-of-enablement attack, which, we have already held, the board rightfully declined to consider.

We have already held that there was no apparent reason why appellants could not have determined through their own resources that the experimental conditions

listed in the Daugherty working example raised what appellants regarded as a problem of enablement. Certainly, evidence produced in resolution of a timely raised motion to dissolve based on lack of enablement would also have brought appellants' so-called "best mode" issue to light. On the facts here, we cannot regard "best mode" as a distinct issue. Appellants have not presented it as such. Thus, we find the board did not abuse its discretion in refusing to consider the "best mode" issue as herein presented.

We do not need to reach the board's finding that applicants failed to exercise diligence between their last alleged date of conception and their filing date. The decision of the board is *affirmed*.

AFFIRMED.

NIES, Judge, dissenting.

The majority erroneously equate appellants' "lack-of-enablement attack" with appellants' best mode attack. In effect, the majority conclude that if the specification sets forth only one working example which is attacked as not being enabling, no separate challenge to best mode may be made. Such is plainly not the law.[1]

Here, appellants (Fenstermacher) have presented two different theories upon which they predicate their argument that appellees (Daugherty) may not rely on their patent as a constructive reduction to practice, neither of which subsumes the other. Appellants' enablement argument is premised, in part, on the theory that in the only working example, given at a pressure of 30 torr, Daugherty failed to provide many of the parameters needed to set up the device to meet the count, e.g., sustainer field strength, E-beam current, and prede-termined electron temperature. Thus, appellants argue, one of skill in the art is not given sufficient information to practice the invention.

The best mode challenge, on the other hand, is directed to failure by Daugherty to set forth, *in addition to the 30 torr example,* an example at the higher pressure to which the invention is directed. Daugherty counters by arguing that 30 torr is "higher pressure," and that the patent specification indicates that 1–10 torr is low pressure. It was not until Daugherty presented its case that appellants learned that, in February of 1970, coinventors Daugherty and Patrick considered low pressure to be anywhere in the range of 30–100 torr, as set forth in a proposal for a Government contract.

In view of the above, it is clear to me that the thrust of Fenstermacher's best mode challenge is not failure to disclose any mode. Rather, it is that Daugherty failed to disclose an example of what they knew to be their best mode, i.e., it was concealed (whether intentionally or not) in view of the poor quality of the disclosure. *In re Sherwood*, 613 F.2d 809, 816, 204 USPQ 537, 544 (Cust. & Pat.App.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981).[2]

Finally, because the facts were not developed until Daugherty's testimony period, unlike the challenge to enablement, the attack on Daugherty's failure to disclose best mode is not untimely. The only limitation to raising the issue before the board is that the party under attack be on notice of the charge so as to avoid surprise. *P. A. B. Produits et Appareils de Beaute v. Santinine Societa*, 570 F.2d 328, 332–33, 196 USPQ 801, 804–05 (Cust. & Pat.App.1978).

---

1. "Satisfaction of the best mode requirement of § 112 is a question separate and distinct from the question of the sufficiency of the disclosure to comply with the enablement provision." *In re Bundy*, 642 F.2d 430, 435, 209 USPQ 48, 52 (Cust. & Pat.App.1981), citing *In re Gay*, 50 CCPA 725, 309 F.2d 769, 135 USPQ 311 (1962).

2. *In re Gay*, supra, which the majority cites as requiring an intentional concealment of best mode was modified *sub silentio* by *In re Sher-* *wood*, 613 F.2d 809, 816, 204 USPQ 537, 544 (Cust. & Pat.App.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). In any event, if Fenstermacher's best mode attack is directed to intentional concealment, such an attack amounts to an allegation of fraud which is ancillary to priority and should, therefore, have been considered. *Langer v. Kaufman*, 59 CCPA 1261, 465 F.2d 915, 175 USPQ 172 (1972).

Inasmuch as Daugherty took testimony during surrebuttal to counter Fenstermacher's rebuttal testimony directed to the best mode issue and the issue was briefed by both parties, the issue was properly before the board. Moreover, the board *did* consider the best mode issue and concluded that it was not an issue ancillary to priority. Thus, I do not agree with the majority that the issue need not be separately treated. Finally, for reasons set forth herein, I conclude that the issue is ancillary to priority and would remand because of the board's failure to consider the best mode issue in making its priority award.

The board, concluding that *Weil v. Fritz*, 572 F.2d 856, 196 USPQ 600 (Cust. & Pat. App.1978), did not overrule *Thompson v. Dunn*, 35 CCPA 957, 166 F.2d 443, 77 USPQ 49 (1948), to the extent that best mode "is not ancillary [to priority] insofar as the issue concerns [an] involved application," held that best mode is also not ancillary to priority with regard to Daugherty's patent. Subsequently, this court rendered its decision in *Tofe v. Winchell*, 645 F.2d 58, 209 USPQ 379 (Cust. & Pat.App.1981), which undermines the board's rationale.

There can no longer be any question that best mode is ancillary to priority when raised against a party's application whether that application is the subject of the interference, *Tofe v. Winchell*, supra, or is a prior application relied on for a priority date. *Weil v. Fritz*, supra. While both cases held best mode ancillary to priority, they did so for different reasons.

Because both parties to an interference must be involved by way of a patent or a valid application, *see Squires v. Corbett*, 560 F.2d 424, 432–33, 194 USPQ 513, 519 (Cust. & Pat.App.1977), we concluded in *Tofe*, supra, that a party in the interference whose application failed to satisfy the disclosure requirements of § 112 lacked standing to be in the proceeding. Thus, we held best mode

ancillary to priority in *Tofe* because that issue raised a question going to the jurisdictional prerequisite of the board's authority to reach the issue of priority. *See also Nitz v. Ehrenreich*, 537 F.2d 539, 190 USPQ 413 (Cust. & Pat.App.1976) (no interference in fact is jurisdictional issue which is ancillary to priority). Our decision in *Tofe* thus required separate holdings to be made by the board, (1) one jurisdictional—i.e., whether best mode was satisfied by the applicant, and (2) one factual issue—i.e., priority "but for" the issue of best mode. Each issue would be reviewed by this court on appeal, the award of priority bringing both issues to us for affirmance or reversal of the priority award or for vacating the award altogether if it were found that the board lacked jurisdiction.

In *Weil v. Fritz*, supra, the junior party attacked the senior party's right to rely on an earlier filed application for a constructive reduction to practice alleging that the earlier application failed to disclose best mode. This court agreed that failure to disclose best mode would preclude reliance on the earlier application's filing date as a constructive reduction to practice. Because the junior party could prevail if the senior party could not rely on its prior application for a constructive reduction to practice, resolution of the best mode issue could have been determinative of priority and, hence, was, in this sense, ancillary to priority. *See also Langer v. Kaufman*, 59 CCPA 1261, 1264, 465 F.2d 915, 918, 175 USPQ 172, 174 (1972) (enablement is ancillary to priority as it affects constructive reduction to practice). *Accord, Kawai v. Metlesics*, 480 F.2d 880, 886, 178 USPQ 158, 163 (Cust. & Pat. App.1973) (constructive reduction to practice requires compliance with the how-to-make and how-to-use requirements of 35 U.S.C. § 112). Thus, best mode is ancillary to priority in connection with an application in an interference in one of two ways.[3] A

---

3. It should be evident that the court no longer confines ancillary to priority to its "classic" definition. *See* C. Rivise & A. Caeser, Interference Law and Practice, Vol. II, § 251, p. 1009 (1943) ("[A]n ancillary question may be defined as a question which, if decided in favor of the

party raising the question, would necessarily result in a *judgment* against his opponent.") Rather, a matter which is ancillary to priority, while not necessarily conclusive thereof, *may* be determinative of priority but is, in any event, logically related thereto. *Nitz v. Ehrenreich*,

challenge to best mode can raise an issue which is jurisdictional in nature, *Tofe*, supra, or it can affect a party's priority date by depriving him of the filing date of an application on which he seeks to rely as his date of constructive reduction to practice. *Weil v. Fritz*, supra.

With respect to a patent in interference, the jurisdictional issue cannot be raised inasmuch as the patent must be presumed valid. 35 U.S.C. § 282. However, with respect to determining who is the prior inventor, in my view the rationale of *Weil v. Fritz*, supra, applies.

A constructive reduction to practice is nothing more than a presumption that the invention was made, *Automatic Weighing Machine Co. v. Pneumatic Scale Corp.*, 166 F. 288, 293-94 (CA 1 1909), which may be overcome by showing that a party is not entitled to rely on its filing date for one of a number of reasons.[4] Failure to disclose best mode is clearly one such reason. *Weil v. Fritz*, supra. That the showing is directed to an application that resulted in a patent I deem of no consequence. It would be manifestly unfair for one party, an applicant, to be subject to such a challenge while in the same proceeding a patentee would be screened from such attack.

Where priority is awarded in reliance on the date of an application as a constructive reduction to practice, the issue of whether that party failed to comply with the disclosure requirements of § 112, including his best mode, must be addressed and must be resolved in his favor.

Alternatively, the board may not have to reach the issue of Daugherty's compliance with best mode should it consider Daugherty's proofs of an actual reduction to practice sufficient.[5] *Lindstrom v. Ames*, 37 App.D.C. 365, 1911 C.D. 384 (1911) (proof of actual reduction to practice negates having to rely on one's filing date for constructive reduction to practice). *See also Starr v. Farmer*, 1883 C.D. 34, 23 O.G. 2325 (Sec'y Int. 1883), wherein it was held that actual reduction to practice may be better evidence of invention than an application but that "until that evidence [the application] is overthrown," *id.* at 38, the applicant need do no more than rely on his application filing date.

In any event, I would remand for determination of Daugherty's right to rely on the date of their application as their priority date or for a determination of priority based on the evidence of Daugherty's actual reduction to practice.

---

537 F.2d 539, 543, 190 USPQ 413, 416 (Cust. & Pat.App.1976). Thus, in *Weil v. Fritz*, 572 F.2d 856, 867, 196 USPQ 600, 609 (Cust. & Pat.App. 1978), the court remanded for the board's consideration of both best mode and other priority proofs. As also noted in *Myers v. Feigelman*, 455 F.2d 596, 600, 172 USPQ 580, 584 n.9 (Cust. & Pat.App.1972), questions which address the shifting of the burden of proof, while ancillary to priority, are not determinative of priority in and of themselves.

4. *See Kawai v. Metlesics*, 480 F.2d 880, 886, 178 USPQ 158, 163 (Cust. & Pat.App.1973) (how-to-make and how-to-use); *Langer v. Kaufman*, 59 CCPA 1261, 1264, 465 F.2d 915, 918, 175 USPQ 172, 174 (Cust. & Pat.App.1972) (enablement).

5. As noted in *Tofe v. Winchell*, supra at 61, 209 USPQ at 382 n.10, only abandonment, suppression or concealment of the *invention* are grounds under § 102(g) for awarding priority de jure to the party who is not the first inventor de factor. Thus, I disapprove of the view expressed by the board in *Magdo v. Peltzer*, 212 USPQ 838, 845 (BOPI 1981) (on Petition for Rehearing):

a party to an interference who has not complied with the "best mode" requirement of the statute has "no right to make" his claims corresponding to the counts and, therefore, is not entitled to an award of priority, irrespective of testimony as to inventive acts ....

*See also* n.3, supra.